**In re THOMSON McKINNON SECURITIES, INC., Thomson McKinnon Inc. and Realty International Corporation, Debtors.**

**Bankruptcy Nos. 90 B 10914, 90 B 11805 and 91 B 13280.**

United States Bankruptcy Court, S.D. New York.

June 2, 1992.

See also 139 B.R. 267, 133 B.R. 39.

Morgan W. Bentley, New York City, for Thomson McKinnon Securities, Inc.

Anthony V. Trogan, Birmingham, Mich., for John, Charles and Thomas Loucks.

## DECISION ON OBJECTIONS TO CLAIMS

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Thomas Loucks and his brothers John and Charles filed claims against the debtor for losses from speculative stock trading in three accounts which they maintained with the debtor in 1987. One of the businesses in which the debtor, Thomson McKinnon Securities, Inc. and its affiliates, had been engaged in before they filed their liquidating Chapter 11 cases with this court on March 28, 1992, was that of an investment broker and securities broker for the purchase and sale of publicly traded securities. The debtor objected to the claims filed by Thomas Loucks and his brothers on the theory that it is not liable for any losses that they may have sustained.

### FACTS

1. All three accounts were opened in January of 1987 and were funded by the deposit of shares in the National Bank of Detroit which each of the Loucks brothers received as a gift from their grandfather. Each deposit was valued at a little over $100,000.00. Thomas Loucks was then 23 years of age and had completed three and one-half years of college. He then worked as a Clerk in a local 7–11 Store in Saginaw, Michigan. His brother Charles, was then 25 years of age and his brother John was then 18 years of age. Thomas had previously engaged in the purchase and sale of stocks for several years and was interested in securities trading. He is now a member of the U.S. Air Corps.

2. Thomas Loucks became acquainted with Dean Russell ("Russell"), a broker employed by the debtor. Russell had been a locally known semi-professional hockey player. Thomas Loucks played on a hockey team where Russell was in charge of alumni activities. Thomas Loucks became friendly with Russell, who also patronized the 7–11 Store where Thomas Loucks was employed.

3. Thomas Loucks was interested in becoming employed as a securities broker with the debtor. Russell informed him that if he could bring in business to the debtor he might be able to get a job with the debtor. Accordingly, Thomas Loucks persuaded his mother and his two brothers to open stock trading accounts with the debtor in addition to the account which he opened for himself. Because John and Charles Loucks relied upon their brother's knowledge and experience they executed powers of attorney in favor of Thomas Loucks to trade their accounts for them.

4. Although Thomas Loucks had never before traded in stock options, he mentioned to Russell that he was interested in trading in stock options. Russell informed Thomas Loucks that he was certified to engage in options trading. Thomas Loucks asked Russell how he could go about funding the proposed options trading and Russell responded that his shares of the National Bank of Detroit could be the source.

5. Thomas' brother, Charles Loucks, testified that he discussed options trading with Russell before he opened an account with the debtor. Russell explained that options trading was a way to make money. Charles was then a student at college, studying electrical engineering. He trusted his brother, Thomas, and Russell to handle the stock trading in his account.

6. To qualify for options trading with the debtor, Thomas Loucks was required to execute a Supplemental Information Agree-

ment For Options Trading. In order to meet the required minimum standards for options trading, information had to be supplied as to the applicant's income, net worth and options trading experience. Thomas Loucks and Russell prepared a form which Thomas signed. However, the form was incorrect. Thomas' income was raised from $14,000.00 per annum to $30,000.00 per annum and his liquid net worth of $105,000.00 was listed as $150,000.00. Moreover, his total net worth was stated to be $200,000.00 and his experience as an investor was stated to be five years of options and stock trading. The debtor's witness testified that had the true facts been known to the debtor, Thomas Loucks would not have been permitted to engage in options trading.

7. Thomas testified that the incorrect information about his financial condition was prepared by Russell, but that he signed the form because Russell advised him to do so.

8. Option forms were also prepared for each of Thomas Loucks' brothers. As in the case of the information with respect to Thomas' financial condition, the financial information submitted with respect to Charles and John was also exaggerated so as to satisfy the debtor's internal requirements for options trading. Both Charles and John signed the options forms.

9. Thereafter, with Thomas Loucks having powers of attorney from his two brothers, he then commenced options trading and stock transactions on margin which were conducted by Russell as the broker for the debtor.

10. From January of 1987 through June of 1987, Thomas Loucks received monthly written statements from the debtor reflecting the trading activities for the previous month with respect to his account and his brothers' accounts for which he acted under the powers of attorney. Thomas testified that he did not review the monthly statements and simply put them away in a drawer. Thomas testified that he became concerned and suspicious in June of 1987. There seemed to be losses in the accounts.

Thomas Loucks then consulted another broker for advice.

11. After June of 1987, Thomas Loucks transferred his account and his brothers' accounts from the debtor to E.F. Hutton, another securities broker. The broker at E.F. Hutton closed out the positions that were opened while the accounts were with the debtor. Thomas Loucks continued to trade options at E.F. Hutton on some of the same securities previously traded through the accounts with the debtor.

12. The only credible evidence as to actual fraud in this case was the deceit perpetrated on the debtor with respect to the financial information and experience concerning Thomas Loucks and his two brothers for options trading, which allowed them to engage in high speculation securities trading which otherwise would have been restricted under the debtor's internal requirements. When Thomas Loucks and his brothers signed these options trading forms they knew that the information was incorrect and also knew that the information in these forms would be relied upon by the debtor for the purpose of opening up their options trading accounts. That Russell may have prompted them to submit this incorrect financial information does not detract from the fact that Thomas Loucks and his brothers knowingly submitted forms which were preconditions for engaging in highly speculative stock transactions in their accounts. Whether or not the brothers intended to submit incorrect and exaggerated financial figures to the debtor is not the point. The key factor is that they knew that the submitted information was required for highly speculative stock transactions in their accounts and they willingly consented to these transactions. They appointed Thomas Loucks as their attorney in fact for this purpose.

13. Thomas Loucks testified that he did not give prior approval to the stock options transactions engaged in by Russell. He did say that he asked Russell about his experience with stock options and Russell satisfied him by informing Thomas that Russell was certified in options trading. Evidently, Thomas Loucks contemplated

that his broker would engage in stock options transactions. Indeed, there is no allegation that Russell's transactions were unauthorized, especially in light of the fact that the evidence demonstrated that Russell's transactions were ratified by Thomas Loucks. There was no evidence that Thomas Loucks questioned any of the transactions reflected in the monthly statements which he received from the debtor from January 1987 until June of 1987, when Thomas Loucks became dissatisfied with Russell's activities. Thomas Loucks testified that in June of 1987 he came to the conclusion that he had to "fire" Russell because his net worth was going down. In other words, until June of 1987, Thomas Loucks did not object to the frequency of the transactions or to the nature of the transactions. The critical point is that Thomas Loucks concluded in June of 1987 that Russell was not making money in the accounts, and instead, Russell appeared to have lost money in handling the accounts for Thomas Loucks and his two brothers. Until then, Thomas Loucks believed Russell, who told him that he was making money in the accounts.

14. The claimants submitted copies of the monthly statements furnished to Thomas Loucks by the debtor reflecting the stock transactions for each of the Loucks brothers' accounts for the period from February through September of 1987. An examination reveals that the corporations involved were known entities, such as Texaco, General Motors, Ford, UAL, Merck, The Limited, Liz Claiborne and Merril Lynch & Co. Thomas Loucks testified that he identified specific stock for Russell to purchase for his account.

15. The debtor's witness testified that the transactions were not excessive for high options trading. The claimants presented no evidence nor analysis of the accounts to support their claim of excessive trading. They simply introduced the monthly statements issued to them by the debtor. They also introduced the monthly statements issued by E.F. Hutton for September 1987 through January 1988. The claimants switched their accounts to E.F. Hutton after Thomas Loucks became dissatisfied with the way Russell and the debtor handled the accounts. The E.F. Hutton statements reflect active transactions in Liz Claiborne, LTV Corp., The Limited, Ford, Atlantic Richfield, Citi–Corp. and Travelers Corporation. The claimants' trading activity with E.F. Hutton does not appear to differ from the pattern they previously established with the debtor.

16. The court cannot conclude from the statements alone, without charts, expert testimony or other independent analysis of the statements, that Russell's stock trading for the claimants was excessive. Indeed, the court cannot conclude from reading the monthly statements whether or not claimants made money or lost money from the totality of the transactions. The monthly statements were simply submitted in evidence as a whole, without any independent analysis or explanation. The claimants offered no other proof to support their claim for damages.

17. The claimants also assert that the broker, Russell, did not disclose to Thomas Loucks the risks of option and margin trading. However, Thomas Loucks admitted that Russell gave him some printed information about these types of transactions, which Thomas Loucks put in his desk drawer without reading. Russell cannot be faulted if Thomas Loucks chose to close his eyes to the warning provided and failed to monitor the transactions.

## DISCUSSION

This case does not involve unauthorized transactions by a stock broker. Thomas Loucks knew that Russell was going to engage in options trading for his account and for those of his brothers for whom he held a power of attorney. Indeed, Thomas Loucks first questioned Russell as to his experience in options trading and was satisfied to learn that Russell was certified to engage in options trading. At times, Thomas Loucks recommended specific stocks to Russell to be purchased for the accounts. Thomas Loucks ratified the transactions and never questioned the monthly statements he received from the

debtor from January 1987 through June 1987, when Thomas Loucks concluded that he was not making money and decided to "fire" Russell. Thereafter, he switched his account and those of his two brothers to E.F. Hutton, where he continued to engage in similar options trading.

What this case does involve is a claim that the broker failed to disclose that the brothers did not qualify for high risk stock transactions, failed to disclose the risks associated with options trading and margin purchases and failed to inform the claimants that they were losing money on the transactions. There is also a claim that the broker engaged in excessive trading, or "churning."

> Churning occurs when a securities dealer creates commissions "by inducing transactions in the customer's account which are disproportionate to the size and character of the account." *Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1069 (2d Cir.1977). To establish a claim for churning a plaintiff must plead and prove (1) that the trading in the account was excessive in light of his investment objectives, (2) that the broker exercised control over the account, and (3) that the broker acted with intent to defraud or with willful and reckless disregard for the interests of his client.

*Moran v. Kidder Peabody & Co.,* 609 F.Supp. 661, 666 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir.1986) (citations omitted).

■ In the instant case, the claimants' failed to establish the first element to support a churning claim, namely, that the trading in the account was excessive in light of the claimants' investment objectives. Thomas Loucks, acting with powers of attorney from his two brothers, opened these accounts with the debtor and intended to engage in options trading. There was no proof that the broker disregarded his investment objectives. He received monthly statements from the debtor as to the trading activities in the three accounts and simply put them into a desk drawer. The broker had every reason to believe that Thomas Loucks ratified the stock trading and was satisfied with the transactions un-

til Thomas Loucks expressed his dissatisfaction in June of 1987 when he "fired" Russell. The plaintiff must establish facts that allow the determination of whether or not trading was excessive. *Id.* at 666. The claimants failed to establish the requisite proof.

■ The charge that the debtor failed to disclose the risks associated with the options trading and margin purchases is also unpursuasive. Investment in the stock market is inherently risky and such information is "so basic that it need not be disclosed by the broker." *Bischoff v. G.K. Scott & Co., Inc.,* 687 F.Supp. 746, 751 (E.D.N.Y.1986). The Second Circuit has held that "[i]t is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." *Zerman v. Ball,* 735 F.2d 15, 21 (2d Cir.1984) (quoting *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1220 (9th Cir.1980)). The allegation that the debtor failed to disclose the risks associated with the options trading and margin purchases was rebutted by the fact that the broker furnished Thomas Loucks with written information as to these risks. However, Thomas Loucks simply put the information in a desk drawer and chose to proceed with the speculative stock transactions.

■ Additionally, the claimants offered no proof as to any damages they might have sustained. In the *Moran* case, the court stated:

> Although [the plaintiff] appends his monthly account statements to the complaint, it does not appear that these statements or his estimate satisfy the requirement that a plaintiff set forth facts that would permit the calculation of the turnover ratio of the account and/or the percentage of the account value paid in brokerage commissions.... *A plaintiff must provide enough information to permit calculation of the defendants' commissions as a percentage of account equity in either monthly or year-to-date basis.*

*Moran,* 609 F.Supp. at 666 (emphasis added) (citations omitted). In the present case,

Thomas Loucks testified that after receiving the monthly statements from the debtor he was not sure if he made money or lost money from the stock trading. Similarly, the court is unable to arrive at any damage figure after reviewing the monthly statements for the three accounts. Apart from submitting the monthly statements into evidence, the claimants offered no other proof as to any specific figure claimed as damages.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(B).

2. The claimants have failed to establish that the debtor and its employee, Russell, engaged in excessive stock trading in their accounts in light of their investment objectives.

3. The claimants have failed to prove that they sustained damages as a result of alleged mishandling of their stock portfolios or that the debtor failed to inform Thomas Loucks as to the risks involved in trading on margin or in options trading.

4. The debtor's objection to the claimants' proof of claim is sustained.

SETTLE ORDER on notice.